

**SIGNED this 30th day of November, 2010.**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 09-10381-CAG |
| | § | |
| BOULDER CROSSROADS, LLC, | § | |
| | § | CHAPTER 11 |
| Debtor. | § | |
| | § | |

### MEMORANDUM OPINION

Boulder Crossroads, LLC ("Boulder" or "Boulder Crossroads" or "Debtor"), filed a petition under Chapter 11 of the Bankruptcy Code on February 17, 2009.  Debtor is a limited liability company which was formed in July of 2006.  It built and, at the time Debtor's Plan of Reorganization was filed, operated a shopping center located at the intersection of Nellis Boulevard and Boulder Highway in Sunrise Manner, an unincorporated area in Las Vegas, Nevada.  The center consists of five in-line buildings and two ground lease buildings.  On December 28, 2009, this Court entered its Order Confirming Debtor's Amended Plan of Reorganization (docket #231).

On March 1, 2010, Debtor filed its Objection to Claim of Lionel Sawyer & Collins (docket #252).  On March 25, 2010, Lionel Sawyer & Collins ("LS&C" or "Creditor") filed its Response to Debtor's Objection to Claim (docket #272).  A hearing was held on August 25, 2010 to consider Debtor's Motion and LS&C's Response.  At trial, representatives for Debtor appeared as did Mr. Rodney Jean of LS&C.  After the trial, several matters were taken under advisement.  The main issues to be considered after the hearing are which standard should be applied to disputed attorney's fees incurred pre-petition, which party bears the burden of proof, how to calculate "reasonable value" of attorney's fees, the status of the retainer paid by Debtor to LS&C, and the conflict of interest alleged by Debtor.

The Court has reviewed the briefs of Debtor and LS&C and has considered the arguments and evidence of counsel.  Based on the foregoing, the Court finds that Debtor's Objection to Claim of Lionel Sawyer & Collins is DENIED for the reasons stated below.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (C) on which this Court can enter a final judgment.  This matter is referred to the Court under the Districts' Standing Order of Reference.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  The following represents the Court's findings of fact and conclusions of law made pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

### BACKGROUND OF DEBTOR

The Debtor is a Nevada limited liability company which was formed in July 2006 for the express purpose of purchasing 6.5 acres of property in an unincorporated portion of Las Vegas, Nevada to build and operate a neighborhood retail center.  The center was completed in January 2008.  Debtor is a single-member limited liability company.  Its sole member is Preferred Retail

Store Developers, LLC ("PRSD").  PRSD consists of two members—Eric Rosenberg and Lynric Management, Inc.  Their membership interests are 99% and 1%, respectively.  Debtor was exclusively managed by Eric Rosenberg from the time it was formed until the date of its bankruptcy.  Rosenberg is the principal and sole member of Debtor and has been since it began operations.

Around August 2005, Wal-Mart Realty, an affiliate of Wal-Mart Stores, Inc., posted an advertisement on its website for the sale of three undeveloped out-parcels around a proposed Wal-Mart Supercenter in Sunrise Manor.  Rosenberg, in his capacity as a principal in PRSD, submitted a bid for this property of $10,350,000, which was accepted around September 2005.  The Purchase Agreement signed by the parties gave PRSD one year to close the transaction ("Escrow Period").  This price was ultimately renegotiated to $9,850,000.

One of Rosenberg's first acts during the escrow period was to put together and retain the team of professionals that would be required to design and construct the improvements.  One of his first hires was EKN Engineering (now doing business as EN Engineering and referred to herein as "EN").  Rosenberg hired EN as PRSD's civil engineers based on the assumption that EN was Wal-Mart's engineering firm and possessed unique knowledge of the entire property.  Also, any conflicts between the civil engineering plans for Wal-Mart's parcel and the shadow center parcels would be avoided if the civil engineering for the entire shopping center was designed by the same engineering firm.  EN was retained to, *inter alia*: (1) represent PRSD in all communications with all the utility providers for the proposed Shopping Center as well as to obtain zoning entitlements from Clark County, and (2) obtain engineering permits from Clark County Public Works, permits from Nevada Department of Transportation and Las Vegas Valley Water District, Southwest Gas, Embarq, and Cox Cable.  Debtor did not anticipate there would

be any problems with utilities for the Shopping Center, as Wal-Mart's due diligence package, prepared in pertinent part by EN, represented that all utilities necessary to develop and operate a shopping center were available.

Rosenberg also retained Nadel Architects ("Nadel") to design the plan site and, shortly thereafter, Roche Constructors ("Roche") as the general contractor for the construction of the Shopping Center. As with EN, Roche had received the contract to build the Wal-Mart Supercenter and Rosenberg believed that PRSD could avoid cost overruns and construction conflicts if it used the same general contractor that had constructed the site improvements on the adjacent portion of the property, and was most knowledgeable about the overall retail development site.

At the same time he was meeting with the professionals he had retained, Rosenberg was negotiating with International Bank of Commerce ("IBC") to finance the project. On April 12, 2006, IBC approved a loan in the amount of $19,082,692 to PRSD to be used "for the acquisition in Las Vegas, Nevada of three tracts of land totaling 6.38 acres and for the construction of 38,000 square feet of retail space and pads for three ground leases" on three "shadow centers of a new 225,000 square foot Wal-Mart located at the southeast corner of Boulder Highway and Nellis." After various modifications, the loan was ultimately approved in the amount of $19,500,000 and guaranteed by Rosenberg. IBC additionally required "credit enhancement" for the loan in the amount of $3,750,000.

Rosenberg was able to obtain the agreement of twelve individuals, in addition to himself, to pledge letters of credit and/or certificates of deposit in amounts ranging from $50,000 to $750,000 to fulfill IBC's credit enhancement requirement. On or about November 10, 2006, Boulder Crossroads executed a Promissory Note and a Note Purchase Agreement in favor of

each of these individuals: the promissory note was a two-year note for the amount being pledged by the individual along with interest at the rate of twenty percent (20%) per annum on any amounts actually advanced, and the note purchase agreement provided for the "purchase" of the note for the face amount owed by the payee of the note.

With its financing approved and credit enhancement in place, Debtor expected that it would be able to obtain its building permits and close on its purchase of the Land on or before the contract with Wal-Mart expired on December 31, 2006.  When it became clear that the permits would most likely not be issued prior to the expiration date because of delays resulting in large part from unforeseen problems with utilities and grading, Debtor elected to proceed to closing as Wal-Mart had made it clear that it would, under no circumstances, extend the closing date.  On December 15, 2006, PRSD assigned the purchase agreement for the Land to Debtor and Debtor closed on the Land and on the loan with IBC, which funded the purchase price. Rosenberg, as the principal of PRSD and the sole member of Debtor, executed certain documents in favor of IBC—*to wit,* a Real Estate Lien Note, in the amount of $19,500,000 ("Note 1"), Deed of Trust, Security Agreement, and Assignment of Leases and Rents and Fixture Filing securing the $19,500,000 Note, dated December 15, 2006.  Also executed at or about the same time was a Construction Loan Agreement ("CLA") by Boulder Crossroads and IBC which was apparently intended to establish the terms and conditions pursuant to which advances would be made under Note 1 and a Guaranty of Note 1 by Rosenberg.

Debtor did not receive its building permits until January 31, 2007, and construction was not commenced until February 7, 2007.  The expected delivery date of the Improvements was initially 230 days from January 8, 2007, or August 26, 2007.  When construction commenced in February, the completion date was revised and Roche agreed to delivery dates for the buildings

of September 25th, October 25th, and November 9th.   Ultimately, one ground lease was delivered in September 2007 and the second in early January 2008, but four of the five buildings were not delivered until January 23, 2008, and the fifth not until early February 2008.

Much of the delay, as well as the cost overruns, that plagued the project were due to issues with Nevada Power providing electricity to the site and originated with Wal-Mart and EN. As previously discussed, Wal-Mart's due diligence package had included a report indicating that the sufficient electric utilities were in place for the intended use of the subject Land.  Rosenberg, from his prior experience in retail development, expected that Wal-Mart, in acting as the "master developer," had replatted its site prior to selling out parcels and would have had sufficient utilities stubbed to the property lines.  His belief that there were no utility service issues was confirmed in the summer of 2006 when EN reported to Rosenberg that Nevada Power was able to deliver electric service from the east and west sides of the Shopping Center, using the existing power lines on the east side of the shopping center along Harmon Avenue, and on the west side of the shopping center along Nellis Boulevard.  Less than one week after Debtor closed on the Land, EN informed Boulder Crossroads that Nevada Power lines servicing the property were insufficient to carry the electric capacity needed to supply electric power to the shadow center in addition to the Wal-Mart, and that Debtor would be required to pay all the costs for replacing and upgrading as many as 10-12 electric poles, as well as retrofitting the size of the power line from the nearest power substation nearly one mile away to the retail development.  The additional, unanticipated cost to cure this problem was at least $600,000.  Debtor expressed its belief that Nadel and Roche also contributed to the delay in completion and cost overruns.  Nadel's plans did not include, *inter alia,* emergency exit sidewalks from all the retail shop rear doors or the required lights in each fire riser room in each building required by Clark County, or designs and

specifications for certain tenant improvement items.  They failed to comply with numerous ADA requirements, and neglected to design into the buildings a stucco expansion joint at key stress points.  Conversely, the plans specified puzzling items such as light poles in the middle of sidewalks and mail slots on every storefront door (even though the common practice for Las Vegas shopping centers for years has been mail delivery to a community mailbox), resulting in unnecessary expense to the Debtor.

Debtor believes Nadel also exacerbated problems the Debtor encountered with the general contractor.  Boulder Crossroads gave examples, stating that the pads for the electric meter cabinets were to be installed no higher than the building foundations: Roche installed these pads too high, creating potential leaks into the buildings, but refused to repair them because it claimed the specifications in Nadel's plans for these elevations were ambiguous.  Similarly, Roche refused to repair problems with respect to the locations of traffic guard bollards and handicap parking stall signing on the ground that Nadel's plan contained conflicting information.

Other problems resulting from Nadel and EN's plans arose throughout the construction, including Roche's refusal to construct 5040 Boulder unless Debtor agreed to an extended General Conditions Change Order of $50,000.  This problem alone was estimated by Boulder Crossroads to have cost Debtor at least $80,000.

By July 2007, as cost overruns were adding up and only the pad sites had been completed and were in the process of being turned over, Rosenberg became concerned that the funds remaining on its note (Note 1) would be insufficient to complete construction of the Improvements, as well as fund tenant improvements until the Shopping Center was leased enough to support itself.  Debtor requested an additional loan from IBC in the amount of $1,139,323.  On July 11, 2007, the Board of Directors for IBC approved an "increase of $1.1

million" to Note 1.   In August 2007, Plaintiff executed certain documents creating new indebtedness in favor of Defendant secured by the same assets as Note 1—*to wit,* a Real Estate Lien Note, dated August 21, 2007, in the amount of $1,139,323 ("Note 2"); (ii) Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing, dated August 23, 2007; and (iii) Uniform Commercial Code Finance Statement dated August 30, 2007.

Rosenberg began to market the property both directly and with the assistance of a leasing agent.  Letters of intent and leases were negotiated with tenants appearing to be creditworthy or who had a proven track record of operation in Las Vegas.

By September 2007, Debtor had leased space in the Shopping Center buildings to the following: Gamestop, Inc., Grab 'n Go Pizza, Java Nevada, LLC, Mikki's Hawaiian Smoke & Gift Shop, Nevada Federal Credit Union, Omnipoint Communications, Inc. d/b/a T-Mobile, Payless Shoe Source, Inc., Ponce Dental, P.C. d/b/a Tender Dental, Radio Shack Corp., Royal Nails, and Tempest International U.S.A. d/b/a Quizno's.

Unfortunately, the economy began to enter a recession in early August 2007 at the height of Debtor's efforts to lease the Shopping Center.  The United States was deemed by economists to officially be in a recession in about the fourth quarter of 2007.   One of the marks of this recession has been the voluminous number of home foreclosures.  Las Vegas has been identified as one of the cities in the United States with the greatest number of home foreclosures and one of the highest drops in home prices.  According to Debtor, many of the prospective types of tenants in a shadow center are locally owned businesses.   Those businesses are often financed by entrepreneurial individuals obtaining second mortgages and SBA loans, and use the equity in their homes as collateral.  This financing source for those types of tenants dried up in 2007.  The steep decline in tourism and gambling revenue in Las Vegas has led to widely reported troubles

for some major casino owners.  All of these events created a cascading effect on the uncertainty of the local Las Vegas economy.  Tempest International Group, USA and Royal Nails informed Debtor in the latter part of 2007 that they were terminating their leases.

In January 2008, Payless Shoe Source informed Rosenberg that it was terminating its lease because Debtor had failed to timely deliver the Leased Premises.  According to Debtor, Debtor's failure to deliver the space in this case was due not to the problems it was having with its contractor, but with Payless Shoe Source's failure to timely comply with its obligations to furnish to Debtor plans for its finish out.  Debtor believes that Payless deliberately attempted to "run the clock" on Debtor's time to complete its finish out so it could terminate the lease without a penalty.

In February 2008, one week after Roche provided Boulder Crossroads with Unconditional Occupancy Permits for the retail buildings, Rosenberg began contacting the tenants who had pre-leased to deliver their spaces to them.  Grab 'N Go Pizza took delivery and opened for business for approximately three months but vacated shortly thereafter without having paid any rent and asserting that they had the right to terminate the lease because Debtor's delivery of the premises was late.

### BACKGROUND OF CREDITOR & CREDITOR'S RELATIONSHIP WITH DEBTOR

Lionel Sawyer & Collins is the largest Nevada based law firm with offices in Las Vegas and Reno.  LS&C's creditor's claim arises out of representation of Boulder Crossroads between May 31, 2007, and June of 2008.  LS&C's invoices to Boulder reflect a total of $253,170.85 in costs and fees billed to Boulder (including prepetition interest on five separate files) and $161,664.75 paid.  The difference is LS&C's claim--$91,506.10.

9

As discussed above, Boulder Crossroads engaged Roche as the general contractor to build the shopping center. Rosenberg contacted Mr. Rodney Jean of LS&C to represent Boulder Crossroads in late May 2007. At this time, construction had been ongoing for several months, and numerous disputes had arisen between Boulder Crosswoards and Roche. There had already been more than a dozen change order requests ("CORs") and over 50 requests for information ("RFIs) from Roche, and a great many of those were unresolved at the time of LS&C's engagement. LS&C was engaged to assist Boulder Crossroads in resolving its dispute with Roche.

The engagement letter between Boulder Crossroads and LS&C, entered into evidence at trial, succinctly described the scope of representation of Boulder Crossroads on page 1 as follows: "Representation of the Client with respect to a dispute with Roche Constructors, Inc. regarding the Boulder Crossroads Shopping Center." Specifics of the engagement letter as well as more details of the disputes between LS&C and Boulder Crossroads will be discussed below.

According to LS&C's Trial Brief, when Boulder Crossroads engaged LS&C, Rosenberg neither advised LS&C of any disputes with Wal-Mart nor asked LS&C to evaluate any claims against Wal-Mart. The initial problems, as described by Rosenberg, were the extensive number of RFI's and COR's submitted by Roche, and delays which made it clear the project would not be completed on schedule. Under the agreements between Boulder Crossroads and Roche, either party could assert claims against the other for delay damages or General Conditions charges, and Rosenberg said he felt he was being "set up" for a General Conditions charge by correspondence he was receiving from Roche. The first goal of the representation by LS&C was to find a way to resolve the disputes over the COR's, give direction to Roche, resolve the potential disputes over delay damages, and get the project rolling again.

**SUMMARY OF TESTIMONY FROM AUGUST 25, 2010**

On August 25, 2010, a hearing was held to consider Boulder Crossroad's Objection to Claim LS&C's Response.  At trial, representatives for Debtor appeared as did Mr. Rodney Jean of LS&C.  Below is a summary of the testimony presented that day.

Debtor objected to LS&C's claims on several bases—that Boulder Crossroads did not receive adequate value in exchange for LS&C's legal services, that LS&C failed to disclose a conflict which prevented LS&C from providing Boulder with unbiased legal advisement, and that LS&C impermissibly applied a retainer paid by Boulder.  During the hearing, Rosenberg testified on behalf of the Debtor and Jean testified on behalf of the Creditor.

During his testimony, Jean testified as to his representation of Boulder Crossroads in the time leading up to Boulder's bankruptcy.  Jean first discussed the engagement letter entered into between LS&C and Boulder.  The engagement letter defines the scope of engagement as "a dispute with Roche Constructors, Inc. regarding the Boulder Crossroads Shopping Center" (Creditor's Ex. 1).  The engagement letter also discussed the general responsibilities of the Client (Boulder Crossroads) and potential conflicts.  *Id.*  Additionally, the engagement letter states that LS&C's services shall be governed by the Rules of Professional Conduct as adopted by the Nevada Supreme Court.  *Id.*

Jean then testified as to several emails between himself and Rosenberg discussing the scope of the various issues Jean was working on for Boulder.  According to Jean, Rosenberg frequently questioned the validity of the information Roche was providing.  Jean presented other emails between himself and Rosenberg documenting the issues LS&C was working on for Boulder.  (Creditor's Exs. 5-11).  Jean also presented an email he sent to Roche documenting some of the problems which were developing at the time.  (Creditor's Ex. 50).  Jean produced

11

emails between himself and Rosenberg to demonstrate the level of background knowledge Jean was required to attain on the contract between Boulder Crossroads and the contractors, the specifications, and the general conditions.  (Creditor's Ex. 13-16).  The emails also show the issues between Boulder Crossroads and Roche and what Jean was doing on behalf of Boulder Crossroads.

Jean presented an email from Rosenberg containing a string that discusses a dust control issue related to the construction at the site.  (Creditor's Ex. 17).  Wal-Mart had been raising concerns about the level of dust coming from the construction at Boulder Crossroads.  Jean raised this because of the conflict of interest issue raised by Boulder Crossroads.  Additionally, Jean presented an email from Rosenberg to Jean discussing Rosenberg's concern that Wal-Mart was attempting to position Boulder Crossroads to be in default by not managing contractors to comply with the conditions in the deed of purchase. (Creditor's Ex. 19).  Jean testified that this was the first mention of any potential issues with Wal-Mart.  He testified that this information was provided to him in order to assist him in understanding the priorities regarding how Rosenberg wanted the sequencing of the construction project to go.

Jean then discussed the work that went into negotiating the second amended construction contract.  He stated that it was at this time that he first consulted with his partner, Mr. Paul Larsen, regarding timing issues and how long it would take to complete the project.  After his discussion with Larsen, Jean wrote to Rosenberg saying that Larsen had done the zoning work for Wal-Mart and that it could take four to five months due to a significant backlog in the permitting office.  (Creditor's Ex. 21).  Rosenberg's response to this email was to ask if LS&C now represented Wal-Mart.  (Creditor's Ex. 22).  Jean responded "Interesting question. I'll check."  (Creditor's Ex. 23).  Jean testified that a few minutes later he wrote Rosenberg back

acknowledging the existence of some open files with Wal-Mart and told Rosenberg that "Wal-Mart would not have been listed or checked as part of our new matter intake process because there did not appear to be anything adverse to Wal Mart in this matter…Rest assured nothing you have said has or will ever be passed on to Wal Mart." (Creditor's Ex. 24). Jean testified that LS&C did not actually do the zoning work for Wal-Mart, but did the zoning work for the party that sold the property to Wal-Mart. Jean stated that he never discussed Boulder Crossroads again with Larsen, until he was asked to respond to discovery in this claims objection.

Jean then discussed an email sent a month after Rosenberg's questions about LS&C's representation of Wal-Mart. In that email, Rosenberg raised an issue about a problem where the subcontractor cut the cart perimeter around the Wal-Mart parking lot. (Creditor's Ex. 25). Rosenberg asked Jean if Boulder Crossroads needed to put the contractors on notice of the issue, to which Jean responded that they should absolutely put them on notice. (Creditor's Ex. 26). Jean testified at trial that he presented this issue because it was something that concerned Wal-Mart and that Boulder Crossroads and LS&C went forward with their representation. Jean also testified that Boulder Crossroads paid for the work LS&C did at this point and that all of the work that Boulder Crossroads disputed occurred much later. Jean pointed to the fact that instead of requesting that LS&C cease their representation of Boulder Crossroads, Rosenberg had LS&C continue doing work for Boulder Crossroads.

Jean testified regarding an issue concerning Mr. Chuck Perkins, an employee of Rosenberg's. Perkins claimed that he had left another job to come work for Boulder Crossroads and had not been paid. Jean discussed this issue, and presented an email between himself and Rosenberg concerning the matter, in order to show the other work that LS&C did for Boulder Crossroads.

Jean then testified about the issues with Boulder Crossroads' tenant, Royal Nails, who had wanted to back out of its lease. In response to Debtor's claim that LS&C had impermissibly settled a claim without Boulder Crossroads' permission, Jean entered exhibits detailing the lease, the conflicts check that LS&C ran, and LS&C's work on the matter. (Creditor's Exs. 29-45). These exhibits present Jean's work in trying to settle the matter between Boulder and Royal Nails. The emails show communications between Jean, Rosenberg, and Royal Nails. Jean testified that responses from Royal Nails were forwarded to Rosenberg. The emails span a five-month period from February 7, 2008, to June 13, 2008. Jean included in his exhibits a complaint he received on October 13, 2008 from an attorney representing Royal Nails. (Creditor's Ex. 46). Jean testified that at this time he was no longer representing Boulder Crossroads, and emailed the attorney for Royal Nails that he had parted company with Boulder at the beginning of the summer, when Boulder stopped paying LS&C's bills. (Creditor's Ex. 47).

Jean testified as to another issue which Boulder Crossroads asserted was a conflict of interest. Jean testified that Rosenberg had mentioned an issue with Java Detour, a tenant of Boulder Crossroads. Jean stated that Rosenberg promised to send Jean information concerning the guarantors of the lease. On February 7, 2010, Rosenberg sent Jean an email identifying the guarantors of Java Detour, including a Mr. J. Dapper. (Creditor's Ex. 53). The email from Rosenberg stated in a parenthetical after Dapper's name that "Your firm is the registered agent for at least one of J's other businesses." *Id.* Jean testified that before he could even run the conflicts check, Rosenberg stated that Boulder was not having LS&C represent them on that matter. Jean stated that he did not believe it would be a per se conflict that LS&C was the registered agent for any entity that Dapper had an interest in, but that it would have been a

situation that Jean would have been concerned enough about that he would have requested a conflict waiver if LS&C had gone forward with the matter.

Jean next testified about the issue between LS&C and Boulder Crossroads concerning late attorneys' fees.  Jean entered into evidence a letter from himself to Rosenberg, dated April 24, 2008, which stated that Boulder Crossroads owed LS&C over $83,000 plus some unbilled work in process and that Boulder Crossroads had made no payment to LS&C since February 26, 2008.  (Creditor's Ex. 55).  The letter also stated that Jean was particularly concerned by Boulder Crossroads' failure to pay because Boulder had previously not acknowledged billings by the architect for the project, Nadel, to which Boulder objected.  *Id.*  Jean stated in the letter that he was concerned that Boulder was not paying its bills due to "some objection to the payment of Lionel Sawyer & Collins' bill of which I am not aware."  *Id.*  After presenting this letter into evidence, Jean testified that Rosenberg had previously expressed that Rosenberg had tremendous problems with Nadel and that Rosenberg did not intend to pay those bills.  Rosenberg had deliberately withheld his concerns from Nadel because he needed to get some information to have Nadel, as the architects for the project, deal with Roche on some matters.  Jean testified that he was concerned that Boulder was repeating the same pattern in choosing to ignore LS&C's bills.  Jean stated that while there were phone calls between the parties on the issue of the bills, he never received any written response to the letter.

Jean entered several additional emails from Jean to Rosenberg, detailing the issues between Boulder Crossroads and LS&C with regards to attorneys' fees.  (Creditor's Exs. 56-59).  The first, dated May 9, 2008, stated that Jean was reluctant to enter into any new matters with Boulder when there was $100,000 in outstanding bills that were over 120 days past due.  (Creditor's Ex. 56).  Jean testified that he communicated with Rosenberg after this email, but still

received no payment.  The next email, dated May 21, 2008, stated that Rosenberg had told Jean that he would bring the account more current, but that LS&C had yet to receive any payments, and that Jean "must decline to do any further legal work for Boulder Crossroads on any matters until all fees and costs are brought current."  (Creditor's Ex. 57).  Jean testified that as of May 21, 2008, Rosenberg had not objected to the amount of the fees or to any sort of conflict of interest with regards to Java Detour or Wal-Mart.

Jean next testified as to the issue of the $15,000 retainer.  Jean entered an exhibit showing the retainer was applied to the balance of the fees on April 10, 2009.  (Creditor's Ex 60).  Jean stated that according to Ex. 57, the outstanding fees were $105,173.89, but that it is after the application of the retainer to the balance (plus some prepetition interest) that brings the final claim of LS&C to $91,506.10.

Jean then testified that his billing rate was $475/hour in 2007 and $500/hour in 2008.  He testified that he believes that to be within the range of reasonable and customary billing rates for lawyers with his level of experience.

During Jean's cross examination, Jean testified that the retainer was applied to the balance on April 10, 2009, after Boulder Crossroads filed for bankruptcy.  Jean acknowledged that no relief from stay was filed prior to taking the retainer.

Jean testified that there were five matters LS&C worked on for Boulder Crossroads— Roche, Payless Shoes, Perkins, Royal Nails, and Quizno's.  Jean additionally acknowledged that the total bill entered into evidence included interest at 12% per year, but that this accumulation of interest was cut off as of January 2009, when Boulder Crossroads filed its bankruptcy case.

Jean next submitted the depositions of Ms. Sandra Olsen, the vice-president and general counsel for Roche, and Mr. Marvin D. Nathan, an attorney in Houston, Texas that had done work

for Rosenberg and Rosenberg's father.  (Creditor's Exs. 3-4).  Jean testified that he entered these depositions in response to the claim that Jean did not provide Boulder Crossroads with adequate counsel.  Jean testified that he had worked with both attorneys—Nathan as co-counsel for Boulder Crossroads, and Olsen as opposing counsel in the matter between Roche and Boulder. Jean pointed to excerpts from the depositions to show that both attorneys felt that Jean was knowledgeable about the facts and law of the case and that Jean represented Boulder Crossroads fairly and zealously within the bounds of the law.

Jean then called his second witness, Mr. Eric Rosenberg.  Rosenberg testified that he read and signed the engagement letter between Boulder Crossroads and LS&C in May 2007. Rosenberg testified that the Boulder Crossroads center was not the first shopping center he was involved with and that he had been involved in roughly 30 to 40 projects of various sizes. Several of these projects, Rosenberg testified, had also been anchored by a Wal-Mart; however the Boulder Crossroads project was the first project Rosenberg had worked on where he purchased the property directly from a Wal-Mart.  Rosenberg stated that he has 12-15 years experience developing shopping centers and had retained lawyers in connection with the other projects he worked on.

Rosenberg testified that he was familiar with legal documents and that the engagement letter, under "scope of engagement", stated that Boulder Crossroads engaged LS&C to provide legal services with respect to a dispute with Roche and that there was no mention of any dispute with Wal-Mart.  Rosenberg went on to testify that there was a dispute with Wal-Mart at the time he signed the engagement letter, but that another firm was handling the matter.  Rosenberg then stated that he was not aware of any document, prior to the email exchange between Rosenberg and Jean on June 27, 2007, that indicated there was a dispute going on with Wal-Mart.

Rosenberg testified that there was no litigation or arbitration going on between Boulder and Wal-Mart at the time the engagement letter was signed. Rosenberg additionally acknowledged that the engagement letter included language that stated "[i]n the event the Client perceives any actual or possible disagreement with the Firm or the Firm's handling of the Matter, the Client shall promptly and candidly discuss the problem with the Firm." (Creditor's Ex. 1).

Rosenberg then testified about the letter Jean sent Rosenberg in regard to unpaid legal fees. (Creditor's Ex. 55). Jean asked Rosenberg about the paragraph in the letter which said ". . . in light of your having not acknowledged billings by Nadel to which you object, I am concerned that you have some objection to the payment of Lionel Sawyer & Collins' bills of which I am not aware." Rosenberg testified that Nadel had been the architect of record for the shopping center and that as of April 24, 2008, Rosenberg did not intend to pay Nadel's bills. Rosenberg testified that Nadel filed a proof of claim in the Boulder Crossroads bankruptcy case and Boulder has filed an objection to Nadel's claim. Rosenberg testified that he had told Nadel about his issues with Nadel's bills and that Jean made a false statement in the letter sent from LS&C to Boulder Crossroads. Rosenberg testified that he never disputed in writing the statement made in the letter. Rosenberg also testified that he never sent a letter or knew of an email he had sent responding to Jean's question in the letter asking if there were any reasons LS&C had not been paid. Rosenberg testified that he could not recall ever having sent an email or letter disputing the statements about the fees made in the other emails sent by Jean.

Rosenberg next testified about the issues with Wal-Mart. Rosenberg testified that leading up to a conference call between Jean, Rosenberg, and representatives from Roche, that Rosenberg and Jean discussed the issue of dust settling on the Wal-Mart property and Rosenberg wanted to make sure that it would not become a bigger issue.

Rosenberg testified that he was concerned when he learned that LS&C had represented Wal-Mart with regard to Wal-Mart's zoning work.  Debtor's Exhibit 7 contains a copy of an email sent from Jean to Rosenberg dated July 16, 2007 (see also Creditor's Ex. 24), discussing LS&C's representation of Wal-Mart.  Rosenberg testified that it is his handwriting on Debtor's Exhibit 7 which says "[t]he only collaboration and filesharing was between Rod [Jean] and his partner Paul [Larsen] to sabotage Boulder Crossroads."  Rosenberg testified that he had not seen any document which would indicate that Jean had provided any information to Larsen that was intended to sabotage Boulder Crossroads.  Rosenberg went on to state that after this email exchange, where Rosenberg learned of LS&C's representation of Wal-Mart, Rosenberg and Jean continued to speak frequently and that Rosenberg never indicated he wanted to change counsel or wrote a letter objecting to LS&C's representation of Wal-Mart.  Rosenberg testified that he was unaware of LS&C ever opening a file for Boulder Crossroads with regard to any matters involving Wal-Mart and that LS&C never appeared in any meeting or proceeding adverse to Boulder Crossroads on behalf of Wal-Mart.  Rosenberg stated that he had no evidence indicating that anything he had said to Jean was ever passed onto Wal-Mart.

Rosenberg testified that LS&C represented Boulder Crossroads for eleven months after learning that LS&C had some open files for Wal-Mart, and that during that time, Rosenberg never indicated that he did not intend to pay LS&C's bills, nor that he ever wrote a letter or email objecting to the continued representation by LS&C.

Rosenberg testified that he never intended LS&C to become involved in any dispute between Boulder Crossroads and Java Detour.  Rosenberg testified that he sent the email listing the guarantors of Java Detour to Jean (Creditor's Ex. 53) in order to confirm what he had learned from looking at the Secretary of State's website, specifically that LS&C was the registered agent

for several businesses in which J. Dapper was the principal. Rosenberg testified that LS&C never billed Boulder for any matters related to Java Detour.

Leonard Simon, Boulder Crossroad's counsel, next presented portions of Olsen's deposition taken August 5, 2010. Olsen stated that she became involved in the disputes between Roche and Boulder Crossroads in May of 2007, at about the same time as Jean became involved. Olsen stated that the level of antagonism between Boulder Crossroads and Roche seemed extensive, and there was a lack of ability to communicate and cooperate at the time she became involved. Olsen stated that she had been involved in numerous projects for Roche where the other side had legal representation. Olsen testified that it would be of great concern if someone were to call her a liar and accuse her of bad faith. Olsen then testified that she remembered an email dated July 2, 2007, sent from Jean to herself where Jean wrote "[h]ow stupid do you think I am? I'm not going to have my client sign an agreement which pushes out the date of completion and have you hit Boulder Crossroads the next day with another 30 days of alleged delay damages for everything else which previously occurred on the job…These proposed changes are in bad faith, and I will be recommending that Boulder Crossroads find an honest general contractor to complete this job." (Debtor's Ex. 3). Olsen stated that she appeared at the deposition willingly and without a subpoena after being contacted by Jean and told of the issues between LS&C and Boulder Crossroads.

Following the presentation of Olsen's deposition, Jean proceeded to cross-examine Rosenberg. Rosenberg testified that when he purchased the property from Wal-Mart, he was under the impression that there was power available to the site. Rosenberg went on to state that he quickly came to the understanding that it would cost upwards of $1 million to bring power to the site. Rosenberg testified that Boulder Crossroads ultimately resolved the problem with the

power company, Nevada Power, by paying just under $250,000 and signing a change order with Roche.  Rosenberg testified that the initial contract between Roche and Boulder Crossroads called for a $25,000 charge in connection with the underground conduit in regards to the on-site portion of the power, but as a result of the problems with the off-site power, the change order with Roche went up approximately $360,000.  Rosenberg testified that at the time Jean was first engaged, Rosenberg explained all these issues and made clear to Jean that Boulder Crossroads was negotiating with Wal-Mart about some reimbursement for the issues related to Nevada Power.  Rosenberg testified that the issues related to Nevada Power and the other issues related to bringing power to the site were the biggest issues encountered in the development of Boulder Crossroads.  Rosenberg then testified that he would not have hired Jean had he known that LS&C represented Wal-Mart and Nevada Power in the past.  Rosenberg testified that he first became aware of LS&C's representation of Wal-Mart in July 2007, after spending a substantial amount of money with LS&C.  Rosenberg stated that at this point in the construction of the shopping center, Boulder Crossroads was on a tight budget and did not have the resources to drop LS&C and find a new lawyer.  Rosenberg testified that he had put a substantial amount of his personal resources into this project and was facing the prospect of personal bankruptcy as well as the bankruptcy of Boulder Crossroads.

Rosenberg stated that he considered replacing Roche as general contractors as a result of all the change order requests, but was concerned that if he did that, the bank would have put the project into default and that Rosenberg would have been sued on the personal guarantee he had put up for the loan and would have been sued by note holders, tenants, and subcontractors.  It was under this backdrop, Rosenberg testified, that Boulder Crossroads hired LS&C to work out the issues with Roche.  Rosenberg testified that he hired Jean to create a dialogue with Roche

and to make it clear that Rosenberg's only intention was to get the project completed as quickly as possible. Rosenberg testified that the approach taken by Jean, with the hostile email discussed above, was not the approach he was looking for when he hired Jean. Rosenberg testified that he believed that Jean's representation actually made the situation between Boulder Crossroads and Roche worse. Rosenberg stated that he did not fire Jean because Jean was in the process of renegotiating the construction contract with Roche, which changed the delivery dates for several different buildings. Rosenberg testified that the new delivery schedule impacted Boulder Crossroads negatively because of the concern that some tenants would use these multiple delivery dates as an excuse to not take possession. Rosenberg testified that Jean removed the liquidated damages in the contract between Boulder Crossroads and Roche, and made the new contract unnecessarily complicated.

Rosenberg then testified that he felt that he did not receive a benefit from the services of Jean and LS&C. Rosenberg testified that Jean was able to reduce the amount of a change order from $135,000 down to $50,000, saving Boulder Crossroads $85,000, but received no other monetary benefit as a result of LS&C's $220,000 representation with regards to the Roche matter.

Simon pointed to the Requests for Admission, where LS&C admitted to having represented Wal-Mart, Nevada Power, Mr. Dapper, and a Mr. Hank Gordon. Rosenberg testified that Gordon was close with Perkins, the gentleman discussed above, and was also a partner with Roche in an office building they owned together from some time in the 1990s to the mid 2000s.

### PARTIES' CONTENTIONS

After the hearing, several issues were taken under advisement: (1) whether LS&C's fees should be disallowed for failure to provide Boulder Crossroads with reasonable value; (2)

whether LS&C's fees should be disallowed due to the alleged conflicts of interest; and (3) whether the application of the deposit was a violation of the automatic stay.  The Court will discuss each issue in turn.

A.      Reasonable Value

1.      Sec. 502(b)(4)

Jean and LS&C contend that they are entitled to their fees as a matter of contract based on the engagement letter.  Rosenberg and Boulder Crossroads contend that this claim should not be allowed because Boulder Crossroads did not receive a benefit commensurate  with the price of LS&C's services.

11 U.S.C. § 502(b)(4) states that if there is an objection to a validly filed claim, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services."  This section applies to all claims for attorneys' fees owed by a debtor for services provided pre-petition, and can be used to disallow a pre-petition claim for fees if those fees are found to be unreasonable.  *In re Gutierrez*, 309 B.R. 488, 492-93 (Bankr. W.D.Tex. 2004).  The Bankruptcy Court for the Western District of Texas, in analyzing this issue for attorneys' services performed in Texas, determined that the contract rate agreed to by the debtor and attorney is not determinative in this context, and the fees "can be evaluated in light of the overall standards that would be applied to any attorney's fee, regardless of how it is calculated—namely the reasonableness standards imposed by the Disciplinary Rules of Professional Conduct applicable to lawyers who practice in Texas."  *Id.* at 494.  In sum, the contract rate billed does not determine the value of the claim once the debtor is

in bankruptcy; at that point, the claim is disallowed to the extent it exceeds the reasonable value for those services. *In re Siller*, 427 B.R. 872, 879 (Bankr. E.D.Calif. 2010); *Sticka v. Geller (In re Stratton)*, 299 B.R. 616, 623 (Bankr. E.D.Oregon 2003).  The reasonable value should be analyzed under both the state's rules of professional conduct (if applicable) and a federal reasonableness scrutiny. *In re Siller*, 427 B.R. 880.

    2.      <u>Burden Of Proof</u>

The Bankruptcy Court for the Eastern District of California recently discussed which party should bear the burden of proof in a § 502(b)(4) case. *In re Siller*, 427 B.R. at 880-81. That court determined that the burden of proof should rest on the attorney or insider who filed the claim for three reasons: (1) that all applicants for awards of professional compensation under 11 U.S.C. § 330 bear the burden of proof on the elements of "reasonable compensation" and there appears to be no reason to suggest the standard under § 502(b)(4) should be different; (2) that creditors filing proofs of claim usually bear the ultimate burden of proof on the validity of their claims, and as § 502(b)(4) involves only the allowance of a claim, there is no reason why the burden should be any different; and (3) that the disallowance under § 502(b)(4) is an expansion of the rules of *Pepper v. Litton*, that insider dealings with a debtor are subjected to rigorous scrutiny and that the burden is on the insider. *Id.* at 881 (citing *Pepper v. Litton*, 308 U.S. 295, 306 (1939)).  This court agrees with that analysis and holds that LS&C bears the burden of establishing the reasonableness of their fees in this case.

    3.      <u>Determination of "Reasonable Value"</u>

As discussed above, the claim for pre-petition fees should be subject to two tiers of reasonableness scrutiny. *In re Siller*, 427 B.R. at 880.  Under the first tier, the claim must meet the reasonableness standard set under applicable state law, otherwise it will be disallowed under

§ 502(b)(1) as being "unenforceable" as not being "reasonable" under "applicable law." *Id.* If the claim meets the state standard, it then must also meet the second tier—federal reasonableness scrutiny. *Id.* (citing *Travelers Cas. & Sur. Co. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-53 (2007)).

B.      State Standard

The Bankruptcy Court for the Western District of Texas, in determining reasonableness under § 502(b)(4), used the reasonableness standards imposed by the Texas Disciplinary Rules of Professional Conduct. *In re Gutierrez*, 309 B.R. at 494.  In that case, the debtor was objecting to the claim of an attorney for work done on the debtor's prior bankruptcy which ultimately failed. In holding that the fees must be reasonable under the Texas Disciplinary Rules of Professional Conduct, that Court stated that fees that at one time appeared reasonable, may, in retrospect, appear unreasonable in a case that does not ultimately succeed. *Id.* at 494.  As that court also noted, this would be the exception, not the rule.  Few courts would make the determination that a fee was not earned simply because the case failed, but if the case's failure was due to the attorney's failure, then a court may find that the fee in question was not reasonable. *Id.* at 494-95.

Debtor has argued here that it was in fact Jean's conduct that caused Boulder Crossroads to receive no value from LS&C's services.  The Court does not find this argument credible or pursuasive, and finds that Jean has carried the burden to show that his fees were reasonable.  In further support of the reasonableness of LS&C's fees, the Court turns its attention to the Nevada Rules of Professional Conduct, Rule 1.5, entitled "Fees."   That rule lays down eight non-exclusive factors for determining the reasonableness of a fee:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the

likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.

NEV. RULES OF PROF'L CONDUCT R. 1.5 (2006).

Of these eight factors, factors 1, 3, 4, 5, 6, and 7 are relevant in this case. Jean credibly represented to this Court the level of skill and background work required to represent Boulder Crossroads in the various disputes LS&C worked on for Boulder Crossroads. Jean also discussed at trial his fees, testifying they were in line with fees charged by partners in other big firms in Las Vegas and nationally. According to Rosenberg, the results obtained by LS&C were not worth the price LS&C charged for their services. Taking Factor 5 into account, this Court believes that the results obtained by Jean were reasonable under the circumstances. Factor 6 provides one of the best reasons to find Jean's fees reasonable—Rosenberg continued having LS&C represent Boulder Crossroads for several months after failing to receive the results he felt Boulder Crossroads deserved, and any objections Rosenberg may have had about LS&C's level of representation were kept to himself. Additionally, Jean has represented that LS&C is a highly respected firm in Nevada. This Court finds the testimony of Jean both credible and persuasive and holds that Jean has met his burden to prove that LS&C's fees are reasonable under Nevada standards.

1.    <u>Federal Reasonableness Standard</u>

There is no case law definitively defining "reasonableness" under § 502(b)(4). It is unclear if the definition is any different than the definition under state law. *See **In re Siller***, 427 B.R. at 885. The Fifth Circuit, however, in discussing reasonable attorneys' fees under § 506(b), articulated several standards the court should consider: the time and labor devoted to the matter,

its difficulty, whether the fee is fixed or contingent, the amount involved, the results obtained, and other awards in similar cases. ***Blackburn-Bliss Trust v. Hudson Shipbuilders, Inc.* (*In re Hudson Shipbuilders, Inc.*)**, 794 F.2d 1051, 1058 (5th Cir. 1986). These factors bear strong resemblance to the factors addressed in determining reasonableness under the Nevada Rules of Professional Conduct. Additionally, it bears noting that Jean presented the Court with detailed accounts of his time spent working for Boulder Crossroads. For these reasons, the Court finds that LS&C has met its burden under the federal standard for reasonableness.

C.     Conflict of Interest

Boulder Crossroads has argued that LS&C's fees should be disallowed due to a conflict of interest which prevented LS&C from adequately representing the needs of Boulder Crossroads. Rosenberg alleged that Jean's and LS&C's prior representation of Wal-Mart, Nevada Power, and a principal of one of Boulder Crossroads prospective tenants presented a conflict of interest. While perhaps Jean should have been more diligent in running conflict checks with anyone Boulder Crossroads may potentially be adverse, this Court believes, based on the testimony presented at Court, that any conflict of interest was *de minimis* and is no reason to either disallow LS&C's fees or require a disgorgement of those fees.

D.     The Application of the Retainer

It is unclear exactly what Boulder Crossroads is alleging LS&C did improperly with respect to the $15,000 retainer paid by Boulder Crossroads to LS&C. However, at trial an issue was raised as to the timing of the application of the retainer to the outstanding fees of LS&C; so in order to be thorough, the Court will discuss whether the application of the retainer was an impermissible violation of the automatic stay.

The majority of cases discussing the status of a retainer paid by a debtor to an attorney deal with the situation where the debtor has paid the attorney for services to be rendered in the debtor's bankruptcy case.  The Bankruptcy Code expressly contemplates the payment of retainers to attorneys in this situation.  11 U.S.C. § 328(a).  Section 329 requires "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation."  As the retainer in this case was not for services rendered or to be rendered in contemplation of Boulder Crossroads' present bankruptcy case, and the retainer was paid before one year before the date of the filing of Boulder's petition, § 329 is inapplicable.

The issue then becomes whether the retainer is considered property of the estate.  In *In re McDonald Bros. Const., Inc.*, the court distinguished between three types of retainer agreements.  114 B.R. 989, 997-1001 (Bankr. N.D.Ill. 1990).  A "classic retainer" is paid by the client in order to secure the attorney's services and preclude the attorney from taking another case.  *Id.* at 997-98.  This type of retainer is earned by the attorney upon receipt, regardless of whether any legal services are ultimately performed and is not considered property of the debtor's estate.  *Id.* at 998.

The second type of retainer is a "security retainer," which is paid by the debtor and held by the attorney to secure payment of fees for future services that the attorneys are expected to render.  *Id.* at 999.  This type of retainer is not considered present payment for future services,

28

but remains the property of the debtor until the attorney applies it to charges for services actually rendered.  *Id.*  The case goes on to discuss how this type of retainer involves "the attorney holding the client's money as a pledge—a possessory security interest and the Uniform Commercial Code expressly allows for a possessory security interest in money."  *Id.*  In the *McDonald Bros.* case, the security retainer being contemplated was for services to be rendered in a bankruptcy proceeding, and the court stated that the funds continued to be owned by the client.  *Id.*  In that case, no services had yet been rendered by the attorney.

The third type of retainer is an "advance payment retainer," which is where the debtor pays, in advance, for some or all of the services that the attorney is expected to perform on the debtor's behalf.  *Id.* at 1000.  In this type of retainer arrangement, ownership of the retainer is meant to pass to the attorney at the time of payment, in exchange for the commitment to provide the legal services.  *Id.*

Additionally, it must be noted that bankruptcy courts generally do not consider portions of a retainer earned prepetition as property of the estate under § 541(a)(1).  *See Stewart v. Law Offices of Dennis Olsen*, 93 B.R. 91 (N.D. Tex. 1988), *aff'd*, 878 F.2d 1432 (5th Cir. 1989); *In re Mondi Forge Co.*, 154 B.R. 232, 237-38 (Bankr. N.D. Ohio 1993).

The Engagement Letter between LS&C and Boulder Crossroads contains a paragraph discussing the retainer.  (Creditor's Ex. 1).  That paragraph states:

> The Client agrees to immediately pay to the Firm for deposit to the Firm's general accounts an initial retainer of $15,000 as an advance against fees, costs and expenses.  The amount of the retainer will be applied against the last bill rendered for this engagement.  An amount equal to the unapplied portion of the retainer, if any, after satisfaction of the last bill, will be promptly paid to the Client by the Firm.

This appears to be an "advance payment retainer," and therefore the retainer is not property of the estate, regardless of when the fees were earned.  However, this is almost a moot point

because the fees were earned well before the filing of Boulder Crossroads' bankruptcy. As stated above, portions of a retainer earned prepetition are not property of the estate. Therefore, there can be no violation of the automatic stay as a result of LS&C's application of the balance of the retainer to the outstanding fees owed by Boulder Crossroads, since at the time of the application, the retainer was not property of Boulder Crossroads' estate.

### CONCLUSION

Having gone through the facts of the case and considered the evidence submitted by the parties, this Court finds that (1) LS&C's fees are reasonable under § 502(b)(4) and should therefore be an allowed claim; (2) there was no conflict of interest to warrant a disgorgement or disallowance of LS&C's fees; and (3) the application of the retainer was not a violation of the automatic stay. For these reasons, Debtor's Objection to Claim of Lionel Sawyer & Collins (docket #252) is DENIED.